UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————

PLUMBERS' UNION LOCAL NO. 12 PENSION
FUND, individually and on behalf of
all others similarly situated,                08 Civ. 1958 (JGK)

                Plaintiff,                OPINION AND ORDER

    - against -

SWISS REINSURANCE COMPANY, ET AL.,

              Defendants.
————————————————————————————

JOHN G. KOELTL, District Judge:

    This is a securities action brought on behalf of a proposed class of investors in Swiss Reinsurance Company ("Swiss Re") pursuant to section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. The lead plaintiff, Plumbers Union Local No. 12 Pension Fund ("Plumbers"), sues on behalf of a putative class of purchasers of Swiss Re's common shares between March 1, 2007 and November 19, 2007 (the "plaintiffs"). The plaintiffs' second amended complaint alleges that the defendants, Swiss Re and two of its senior officers, Jacques Aigrain and Georges Quinn (the "individual defendants"), violated section 10(b) and Rule 10b-5 by making false or materially misleading disclosures about Swiss Re's risk management and exposure to mortgage-related securities. The plaintiffs also allege control-person

liability against the individual defendants pursuant to section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

The defendants initially moved to dismiss the second amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that it failed to satisfy the pleading standards set out in Rule 9 of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737. After the close of briefing, the Supreme Court decided Morrison v. National Australia Bank, Ltd., 130 S. Ct. 2869 (2010). The defendants thereafter supplemented their motion to dismiss, arguing that section 10b and Rule 10b-5 did not apply to the securities issued by Swiss Re under the holding of Morrison. The plaintiffs contested the effect of Morrison and argued alternatively that they could maintain a claim for common law fraud if Morrison barred their Exchange Act-based claim.


I

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007); Arista Records LLC v. Lime Group LLC, 532 F. Supp. 2d 556, 566 (S.D.N.Y. 2007). The Court's function on a motion to

dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.; see also SEC v. Rorech, 673 F. Supp. 2d 217, 221 (S.D.N.Y. 2009).

A claim under Section 10(b) sounds in fraud and must meet the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b). Rule 9(b) requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). The PSLRA similarly

3

requires that the complaint "specify each statement alleged to have been misleading[ and] the reason or reasons why the statement is misleading," and it adds the requirement that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); see also ATSI Commc'ns, 493 F.3d at 99.

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Rorech, 673 F. Supp. 2d at 221.

## II

The following facts are undisputed, unless otherwise indicated.

### A

Swiss Re, the world's largest reinsurer, is headquartered in Switzerland; its stock is traded on the Swiss stock exchange. (Second Am. Compl. ("complaint" or "SAC") ¶¶ 2, 18.) At all

relevant times, defendant Jacques Aigrain was Swiss Re's chief
executive officer ("CEO"). (Id. ¶ 19.) Defendant Georges Quinn
was appointed chief financial officer ("CFO") of Swiss Re on
March 1, 2007, the day the class period began; prior to that, he
had served as CFO of Swiss Re's financial services business
group and as regional CFO for Swiss Re Americas. (Id. ¶ 20.)

Plumbers purchased shares of Swiss Re's common stock on 16
separate days between September 7, 2007 and November 6, 2007.
(Mario Alba Jr. Decl. Ex. C (Doc. No. 6).) Plumbers' portfolio
managers decided to purchase its Swiss Re shares in Chicago, and
its purchase orders were placed electronically by traders
located in Chicago. (Atkinson Aff.) "Specifically, these
purchase orders were electronically routed through electronic
connections that [Plumbers' traders] maintai[n] with a number of
brokers who are responsible for matching purchase orders for
Swiss Re stock with shares of Swiss Re stock that are offered
for sale." (Id.) The shares were ultimately purchased on a
foreign exchange. (Hr'g Tr. 14, July 14, 2010; Pfanner Decl.)
During the class period, the only stock exchange on which Swiss
Re common stock was listed was the SWX Stock Exchange (which has
since been renamed the SIX Swiss Exchange) and the only stock
exchange on which Swiss Re common stock was traded was virt-x
(later also known as SWX Europe). (Pfanner Decl.) Stock market
transactions in Swiss Re common stock during the class period

were executed, cleared, and settled on the virt-x trading platform, which was a subsidiary of SX Swiss Exchange based in London. (Id.)

B

Swiss Re provides reinsurance, insurance, and financial services in three categories: Property & Casualty ("P&C"), Life & Health, and Financial Services. (SAC ¶ 29.) Its Financial Services division both provided risk and capital management services to Swiss Re customers and engaged in proprietary asset management. (Id. ¶ 30.) The Financial Services segment represented 5% of Swiss Re's revenues and 8% of its operating income in 2006. (Id. ¶ 31.)

At issue in this case is the Financial Services division's involvement with mortgage-related securities — in particular, sub-prime residential mortgage-backed securities ("RMBS") and collateralized debt obligations ("CDOs") — in its capacities as Swiss Re's proprietary asset manager and as a provider of risk management to Swiss Re customers.[1] As of mid-March 2007, Swiss Re had $7.87 billion in investments exposed to the U.S. mortgage sector, amounting to 8.4% of its relevant managed assets. (Id. ¶

---

[1] A residential mortgage-backed security ("RMBS") is an asset-backed security whose underlying assets are residential mortgages. (SAC ¶ 39.) A collateralized debt obligation ("CDO"), as defined in the complaint, refers to securities that are collateralized by a pool of RMBS tranches. (SAC ¶ 44.)

6

70.) As of August 2007, approximately CHF[2] 500 million of these investments were exposed to the U.S. sub-prime market, increasing to CHF 2.9 billion in sub-prime assets by September. (Id. ¶ 79; Burns Decl. Sept. 4, 2009 Ex. D.)

A credit default swap ("CDS") is a contract under which a purchaser makes a series of payments to the CDS seller in exchange for credit protection in the event that a particular credit instrument covered by the CDS experiences a defined event (such as a default, bankruptcy, or credit rating downgrade). The occurrence of such an event triggers a payment by the CDS seller to the purchaser of the CDS. The CDS functions as a form of insurance because the buyer of the CDS makes periodic payments and in return receives a sum of money if one of the events specified in the contract occurs. (SAC ¶ 48.) See also Rorech, 673 F. Supp. 2d at 222.

Swiss Re used CDSs and other hedging instruments to balance the risk associated with its managed assets. (Burns Decl. Oct. 9, 2009 Ex. B at 20.) It also sold CDSs to financial institutions as part of the Financial Services division's risk management offerings, insuring those institutions against default on their own investments in mortgage-related securities in exchange for regular payment of premiums. (SAC ¶¶ 49, 52.) On

---

[2] CHF, or the Swiss franc, is the currency of Switzerland and Liechtenstein. During the Class Period, the CHF:USD exchange rate generally ranged from 1.15 to 1.2. (SAC ¶ 4 n.1.)

7

November 19, 2007, Swiss Re announced a CHF 1.2 billion loss on two of the CDSs it had sold, which protected portfolios that consisted "largely of mortgage backed securities." (Id. ¶ 99.) Although the majority of the assets protected by these CDSs were prime and mid-prime securities, some of the assets were sub-prime securities or asset-backed securities ("ABSs") in the form of CDOs. (Id.) All told, the two CDSs insured CHF 5.3 billion of assets, including CHF 1.473 billion in sub-prime mortgage securities, CHF 368 million in non-prime, Alt-A/Alt-B mortgage securities, and CHF 953 million in asset-backed CDOs. (Id. ¶¶ 55-56.) Prior to October, "every element" of the CDOs had been rated AA or AAA; after they collapsed to D-level ratings, Swiss Re marked the value of the CDOs down to zero. (Id. ¶¶ 57, 99, 107.) It simultaneously wrote the value of the sub-prime securities down to 62% of their original value. (Id. ¶¶ 57, 99.)

These two CDSs were apparently the only CDS contracts involving structured finance assets such as RMBS or CDOs that Swiss Re sold. (Id. ¶ 109.) Swiss Re also had sold CDSs that were "diversified across a number of corporate credits" that exposed it to CHF 54 billion in credit risk. (Id. at ¶ 110.)

When Swiss Re disclosed the CDS losses on November 19, its stock dropped from CHF 97.55 to CHF 87.55, declining further to CHF 79.95 the following week. (Id. ¶ 8.) In this period,

analysts expressed surprise about Swiss Re's involvement in the sub-prime and CDS business. (Id. ¶¶ 8, 106-08.)

C

The second amended complaint describes a number of statements that the defendants made during the class period, some of which are alleged to be false or misleading and some of which are proffered as evidence of scienter. These statements relate to three topics: Swiss Re's involvement with mortgage-related securities and, in particular, with the sub-prime mortgage market; Swiss Re's risk management practices; and the value of Swiss Re's earnings and accounts.

1

On May 8, 2007, Swiss Re issued its First Quarter 2007 Report and held a conference call for investors. (Id. ¶¶ 66, 68.) A slide accompanying the conference call stated that Swiss Re had "significantly reduced its subprime RMBS exposure," leaving the Financial Services group with "total exposure (at current USD market values) of USD [7.87 billion] to the US mortgage sector, or 8.4% of relevant assets under management." (Id. ¶ 70.) The slide also noted that Swiss Re saw the "continued repricing of subprime RMBS" as "an opportunity," and "had added some investments in the subprime RMBS sector" in the

previous "few weeks." (Id.) On the conference call, Quinn stated
that Swiss Re had "bought" "protection . . . for both equity and
credit risk." (Id. ¶ 68.)

On August 7, 2007, Swiss Re issued its Second Quarter 2007
Report, again accompanied by a conference call and a slide
presentation. (Id. ¶¶ 77-80.) Narrating the slide presentation,
Quinn stated that Swiss Re's CHF 190 billion of invested assets
was "exposed to sub-prime of less than CHF 500m." (Id. ¶ 79.) He
then went on to say:

> For the sake of completeness . . . there are sub-prime
> risks elsewhere in the balance sheet, and I'll try to
> summarize some of them for you. It will exist in the
> portfolio of CDS business and the Financial Guarantee
> Re, which both sit within our traditional credit
> business, also in swaps and also elsewhere in the P&C
> book. The credit characteristics of those risks are
> typically extremely high, double A minus or better,
> and the risk that these areas expose us to is
> significantly less than the risk that we're exposed to
> through the investment that we've made recently in
> sub-prime bonds.

(Id.) The accompanying slides stated that "[t]ypically high
credit quality sub-prime risks (AA minus or better) exist in
portfolio CDS, swaps and Financial Guarantee Re, but not in
leveraged form; risk is lower than exposure to subprime in
invested assets." (SAC ¶ 79.) In answer to an analyst's question
about what Swiss Re had "invested in ABS, MBS, corporate bonds
and COs, CDOs," Aigrain stated that "any of the sub-prime-
related exposure, direct or indirect in their format, are not in

10

CDO form. . . . [A]ny exposure, which is any way extraordinarily modest, is in normal structures of layers or non-CDO layers, which are highly rated typically." (Id. ¶ 81; Burns Decl. Sept. 4, 2009, Ex. F.)

The Second Quarter 2007 Report acknowledged that Swiss Re used swaps and other derivative financial instruments "in its trading and hedging" strategies, with "objectives includ[ing] managing exposure to price, foreign currency and/or interest rate risk . . . and locking in attractive investment conditions." (SAC ¶ 77.) Referring to these contracts, the report stated that "[t]he maximum potential loss assuming non-performance by all counterparties" approximated CHF 4.206 billion as of June 30, 2007. (Id.; Burns Decl. Oct. 9 2009, Ex. B.)

On November 6, 2007, Swiss Re issued its Third Quarter 2007 Report and held a conference call for investors. (SAC ¶¶ 92-96.) This report stated that "Swiss Re put credit default swaps in place" to manage its exposure to credit risks, and that it "protects its equity portfolio by actively using equity derivative instruments." (Id. ¶ 92.) In the conference call, Quinn declined to give specific figures on the breakdown of the gains and losses in the Financial Services segment, but did comment that ABSs were "a small component" of the overall value at risk in the division. (Id. ¶ 96.) Quinn acknowledged that

11

Swiss Re did have some exposure to the credit problems going on throughout the financial world, but described the credit risk as "very, very modest." (Id.) Asked whether the risk was in "toxic stuff" or "just plain vanilla CDS, Corporate Bonds," Quinn said that the instruments in the trading portfolio were "nothing particularly exotic," while the "credit side" was "a fairly traditional long shot type of approach" in which "[t]he credit qualities are typically very good." (Id.) He then said that "ABS and equity derivatives would be the other two components," and stated that the "approach to the credit risk that, particularly, would be embedded in ABS . . . would be consistent with what you see elsewhere in the asset management portfolio. And what that really means is that we've obviously favored the very high quality end of the spectrum." (Id.) Quinn acknowledged that "there isn't any part of the credit quality spectrum that's been spared." (Id.)

2

Regarding risk management, Swiss Re repeatedly portrayed itself as taking a "cautious stance" in relation to things such as credit risk and its investment portfolio. (Id. ¶¶ 77, 89.) Swiss Re trumpeted its "active management of financial market risk" and its ability to "manage volatility." (Id. ¶¶ 66, 73.)

3

In their second amended complaint, the plaintiffs allege that Swiss Re's earnings and accounting statements were incorrect in two ways: first, because they did not disclose the CDSs that the Financial Services division had sold, in violation of generally accepted accounting principles ("GAAP") (id. ¶¶ 118-28) and, second, because Swiss Re overstated its earnings by failing to mark them to market value (id. ¶¶ 129-61). (While the defendants explicitly dispute the latter allegation, they do not controvert the plaintiffs' allegation that they violated GAAP, and argue that, even if the allegation were true, it is insufficient to establish scienter.)

First, Swiss Re stated repeatedly that its financial statements were "prepared in accordance with" GAAP. (Id. ¶ 116.) Even though GAAP Financial Accounting Standards Board ("FASB") Interpretation No. 45 ("FIN 45") required that any guarantor disclose the nature and amount of any guarantee, "even if the likelihood of the guarantor's having to make any payments under the guarantee is remote," Swiss Re did not disclose its obligations under the CDS that its Financial Services division had sold. (Id. ¶¶ 118-20.) FIN 45 "generally excludes guarantees issued by insurance and reinsurance companies," but allegedly did apply to these CDS arrangements because they "were

associated with non-insurance related financial services." (<u>Id.</u> ¶ 118 n.3.)[3]

Second, the plaintiffs allege that Swiss Re misstated the value of its CDS arrangements by failing to mark them to market value in conformity with GAAP and with Swiss Re's own statements that it marked assets to market value. (<u>Id.</u> ¶¶ 96, 129, 131.) The plaintiffs point to the general deterioration of the value of sub-prime and non-prime RMBS beginning by December 2006, along with falling property values and rising interest rates, as evidence that "the value of the CDS arrangements issued by Swiss Re decreased dramatically." (<u>Id.</u> ¶¶ 135-50.) AAA and AA RMBS also began to fall in value toward the end of the first half of 2007. (<u>Id.</u> ¶ 154.) Nevertheless, Swiss Re did not write down the CDS arrangements as their value was sinking, as would be required by mark-to-market accounting, but rather wrote them down "in one fell swoop" in November 2007. (<u>Id.</u> ¶ 158.)


### III

The first issue in this case is whether a security that is not traded on a domestic stock exchange is "purchase[d] . . . in the United States" for the purposes of section 10(b), <u>see</u>

---

[3] The complaint alleges three similar violations of GAAP standards (SAC ¶¶ 121-27), but the plaintiffs did not press any argument based on these violations in their motion papers or at argument.

14

Morrison, 130 S. Ct. at 2886, any time an investor decides to purchase the security and places a purchase order with a broker while in the United States.

A

Section 10(b) makes it unlawful

> [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe.

15 U.S.C. § 78j. Prior to the Supreme Court's decision in Morrison, the Court of Appeals for the Second Circuit determined that whether the purchase or sale of any security not registered on a national securities exchange was subject to section 10(b) should be decided by evaluating "(1) whether the wrongful conduct occurred in the United States, and (2) whether the wrongful conduct had a substantial effect in the United States or upon United States citizens," inquiries "known respectively as the 'conduct test' and the 'effects test.'" S.E.C. v. Berger, 322 F.3d 187, 192-93 (2d Cir. 2003), abrogated by Morrison, 130 S. Ct. 2869. If these tests, alone or in combination, were satisfied, then the purchase or sale of a security not

15

registered on a national securities exchange was subject to
section 10(b).

In Morrison, however, the Supreme Court disapproved the
conduct and effects tests. Morrison identified several problems
with the Second Circuit's tests:  they ignored the traditional
presumption against extraterritorial application of statutes;
they lacked "a textual or even extratextual basis"; and they
resulted in "unpredictable and inconsistent application." Id. at
2878-81. The Supreme Court found "no affirmative indication in
the Exchange Act that § 10(b) applies extraterritorially" and
therefore held that it applies only domestically. Id. at 2883.
The Supreme Court then rejected the argument that the locus of
deceptive conduct is relevant to the applicability of section
10(b), holding that "the focus of the Exchange Act is not upon
the place where the deception originated, but upon purchases and
sales of securities in the United States." Id. at 2884. The
Court thus established a "transactional test" to determine
whether the purchase or sale of a security could be the subject
of a section 10(b) suit: "whether the purchase or sale is made
in the United States, or involves a security listed on a
domestic exchange." Id. at 2886. This test was based on the text
of section 10(b) and other provisions of the Exchange Act, as
well as an analysis of contemporaneously enacted legislation and

the need to adopt "a clear test" to avoid "incompatibility with the applicable laws of other countries." Id. at 2884-86.

The suit resolved in Morrison was a "foreign-cubed" action: it involved "foreign plaintiffs suing foreign and American defendants for misconduct in connection with securities traded on foreign exchanges." Id. at 2875. Aside from the fact that the defendants allegedly engaged in deceptive conduct and made misleading statements in Florida, the facts of the case had no tie to the United States. Accordingly, while Morrison held that a domestic purchase or sale is necessary (and, as far as that opinion reveals, sufficient) for section 10(b) to apply to a security that is not traded on a domestic securities exchange, it did not have occasion to discuss what it means for a purchase or sale to be "made in the United States." It did, however, make it clear that that question is guided by the text of the Exchange Act and by the need to adopt clear tests that avoid "interference with foreign securities regulation." Id. at 2886.

B

Section 3 of the Exchange Act provides that, "unless the context otherwise requires," the term "purchase" "include[s] any contract to buy, purchase, or otherwise acquire." 15 U.S.C. § 78c(a), (a)(13). This language has been interpreted to make an individual a "purchaser" when he or she "incurred an irrevocable

17

liability to take and pay for the stock." Blau v. Ogsbury, 210
F.2d 426, 427 (2d Cir. 1954). See also Blue Chip Stamps v. Manor
Drug Stores, 421 U.S. 723, 751 (1975) ("[T]he holders of puts,
calls, options, and other contractual rights or duties to
purchase or sell securities have been recognized as 'purchasers'
or 'sellers' of securities for purposes of Rule 10b-5, not
because of a judicial conclusion that they were similarly
situated to 'purchasers' or 'sellers,' but because the
definitional provisions of the 1934 Act themselves grant them
such a status." (emphasis added)).

The plaintiffs argue from this definition that a purchase
occurs when and where an investor places a buy order. Other
courts considering similar claims have unanimously rejected this
construction. See In re Societe Generale Secs. Litig., No. 08
Civ. 2495, at *9-10 (S.D.N.Y. Sept. 29, 2010) (slip op.) ("By
asking the Court to look to the location of 'the act of placing
a buy order,' and to . . . 'the place of the wrong,' Plaintiffs
are asking the Court to apply the conduct test specifically
rejected in Morrison."); Cornwell v. Credit Suisse Group, No. 08
Civ. 3758, 2010 WL 3291800, at *1 (S.D.N.Y. Aug. 11, 2010)
("Cornwell II") (describing an earlier ruling in the case as
"foreclos[ing] the application of § 10(b) to any claims related
to foreign securities trades executed on foreign exchanges even
if purchased by American investors"); Quail Cruises Ship Mgmt.

18

Ltd. v. Agencia de Viagens CVC Tur Limitada, No. 09-23248-CIV, 2010 WL 3119908, at *3 (S.D. Fla. Aug. 6, 2010) (holding that a purchase agreement for a foreign corporation's stock is not subject to section 10(b) even if the closing occurred in the United States); Stackhouse v. Toyota Motor Co., No. CV 10-0922, 2010 WL 3377409, at *1 (C.D. Cal. July 16, 2010) ("'[D]omestic transactions' or 'purchase[s] or sale[s] . . . in the United States' means purchases and sales of securities explicitly solicited by the issuer within the United States rather than transactions in foreign-traded securities where the ultimate purchaser or seller has physically remained in the United States." (alterations in original)).[4]

As these courts have held, "purchase" cannot bear the expansive construction plaintiffs propose, at least for the purposes of Morrison's transactional test. The text of the Exchange Act requires that "context" be considered in constructing terms such as "purchase." See Marine Bank v. Weaver, 455 U.S. 551, 558-59 (1982) ("[T]he 1934 Act provides that an instrument which seems to fall within the broad sweep of the Act is not to be considered a security if the context otherwise requires."). As the Supreme Court emphasized in

---

[4] The Stackhouse court noted that it was not making "a final determination of the issue," as it was considering the issue only for the purpose of appointing a lead plaintiff in a class action. Stackhouse, 2010 WL 3377409, at *1.

Morrison, where a security is traded only on a foreign exchange, "the adoption of a clear test that will avoid" "interference with foreign securities regulation" is of paramount concern. Morrison, 130 S. Ct. at 2886. This could not be accomplished if every security traded on a foreign exchange were subject to section 10(b) whenever an investor located in the United States placed an electronic order. In this case, the plaintiff never asserts that its order was irrevocable when placed and concedes that the purchase was made on a foreign exchange. The plaintiffs' construction would require a fact-bound, case-by-case inquiry into when exactly an investor's purchase order became irrevocable. It would also produce the regulatory multiplicity that the Supreme Court has directed courts to avoid. Indeed, were plaintiffs' construction accepted, Morrison would have "upend[ed] a significant area of securities law," id. at 2895 (Stevens, J., concurring), for naught.

Accordingly, as a general matter, a purchase order in the United States for a security that is sold on a foreign exchange is insufficient to subject the purchase to the coverage of section 10(b) of the Exchange Act. There may be unique circumstances in which an issuer's conduct takes a sale or purchase outside this rule, but the mere act of electronically transmitting a purchase order from within the United States is not such a circumstance.

C

Under this construction of section 10(b), the plaintiffs'
claims must be dismissed. Swiss Re is a Swiss corporation; the
stock at issue in this case was listed on the SWX Swiss
Exchange, and stock market transactions in Swiss Re common stock
were executed, cleared, and settled on the virt-x trading
platform, which was a subsidiary of the SWX Swiss Exchange based
in London. The plaintiffs have conceded that Plumbers purchased
its shares on a foreign exchange. (Hr'g Tr. 14, July 14, 2010.)
The plaintiffs argue that Plumbers' purchase is a domestic one
because (a) Plumbers "is a U.S. resident"; (b) Plumbers "made
the decision to invest in the U.S."; (c) Plumbers "suffered harm
in the U.S."; (d) Plumbers' "orders for Swiss Re stock were
placed from Chicago"; and (e) the "traders who executed the
purchase orders for Swiss Re stock were located in Chicago."
(Pl. Supp. Mem. 8-9.) These allegations do not suffice to
establish a domestic purchase.

The first three alleged facts are plainly irrelevant to the
Supreme Court's transactional test. A purchaser's citizenship or
residency does not affect where a transaction occurs; a foreign
resident can make a purchase within the United States, and a
United States resident can make a purchase outside the United
States. Nothing in Morrison or the text of the Exchange Act
allows for any identity-based inquiry in determining the

21

location of a transaction. See Cornwell v. Credit Suisse Group,
No. 08 Civ. 3758, 2010 WL 3069597, at *3 (S.D.N.Y. July 27,
2010) ("Cornwell I") ("Plaintiffs would exclude from operation
of the new test transactions in securities traded only on
exchanges abroad if the purchase or sale involves American
parties . . . . But insofar as this proposition superimposes an
exclusion based strictly on the American connection of the
purchaser or seller, it simply amounts to a restoration of the
core element of the effect test.")

For the same reasons, the fact that an investor may have
decided to purchase a stock in the United States has no bearing
on where the stock was ultimately purchased. See id. at *1
(rejecting argument that an investor who "made an investment
decision and initiated a purchase of [a foreign stock] from the
U.S." and "took the . . . stock into its own account in the U.S.
and incurred an economic risk in the U.S." could sue under
section 10(b)).

Similarly, the location of the harm to a plaintiff is
independent of the location of the securities transaction that
produced the harm. Just as the situs of a defendant's allegedly
deceptive conduct is irrelevant to the transactional test, see
Morrison, 130 S. Ct. at 2883-84, 2886-87, so too is the situs of
a plaintiff's alleged injury. Given that "[n]ot deception alone,
but deception with respect to certain purchases or sales is

necessary for a violation of the statute," id. at 2887 (emphasis
added), there is no textual or logical basis for making injury a
sufficient condition for the statute's application without the
existence of a domestic purchase or sale. See Cornwell I, 2010
WL 3069597, at *6 (holding that Morrison "preclude[s]
extraterritorial application of § 10(b) to foreign securities
transactions involving alleged wrongful conduct that could cause
harm to American investors in the United States").

The place from which Plumbers' traders placed Plumbers'
orders or executed the trades also does not affect the location
of Plumbers' purchase, for the reasons discussed above. For the
purposes of determining whether a securities transaction is a
"domestic" transaction under Morrison, the country in which an
investor happened to be located at the time that it placed its
purchase order is immaterial. See Stackhouse, 2010 WL 3377409,
at *1 ("[B]ecause the actual transaction takes place on the
foreign exchange, the purchaser or seller has figuratively
traveled to that foreign exchange — presumably via a foreign
broker — to complete the transaction.").

Accordingly, because the transactions at issue are not
covered by section 10(b), the defendants' motion to dismiss must
be granted.

23

**IV**

Because section 10(b) and Rule 10b-5 do not apply to the purchase of Swiss Re shares at issue in this case, the plaintiffs' federal claims must be dismissed. After <u>Morrison</u> was decided, however, the plaintiffs argued that they could assert their claims under state common law and that the Court would have diversity of citizenship jurisdiction over such a claim.[5] Because the parties had already briefed their arguments on the merits of the plaintiff's fraud claim, the parties stipulated that the dismissal of the plaintiffs' section 10(b) claims "pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), for failure to state a claim" would also "be dispositive of any common law fraud claim that [the plaintiffs] may alternatively allege." (Doc. 39 at 3.)[6] Therefore, the Court will consider the defendants' argument that the second amended complaint fails to allege with particularity either (1) materially false or misleading statements or (2) scienter.

---

[5] The plaintiffs also noted that they might have a claim under Swiss law, but they have not pursued that avenue.
[6] The stipulation plainly refers to the effect of a dismissal under Rule 9(b) and 12(b)(6), rather than a dismissal under <u>Morrison</u>.

A

1

Section 10(b), as implemented by Rule 10b-5, makes it "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). To state a claim under section 10(b) and Rule 10b-5, a plaintiff must allege that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff. Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000).

The plaintiffs argue that the second amended complaint alleges both false statements of material fact and true statements that are rendered misleading by material omissions. An omission is actionable under federal securities laws "only when the [defendant] is subject to a duty to disclose the omitted facts." In re Time Warner Inc. Secs. Litig., 9 F.3d 259, 267 (2d Cir. 1993). Even though Rule 10b-5 imposes no duty to disclose all material, nonpublic information, once a party chooses to speak, it has a "duty to be both accurate and complete." Caiola v. Citibank, N.A., N.Y., 295 F.3d 312, 331 (2d

25

Cir. 2002). "[E]ven an entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it . . . materially misleading." In re Bristol Myers Squibb Co. Sec. Litig., 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008).

2

The plaintiffs rely on three categories of allegedly false or misleading statements.[7] First, they allege that the defendants falsely or misleadingly represented that Swiss Re "possessed minimal exposure to sub-prime and other risky, non-traditional U.S. residential mortgage securities." (SAC ¶ 3.) Second, they allege that the defendants falsely or misleadingly represented that Swiss Re "employed sound risk management practices and controls." (Id.) Third, they allege that the defendants engaged in "materially false and misleading financial reporting . . . by failing to properly mark to market, in conformity with [GAAP], the true value of" the credit default swaps sold by Swiss Re.

---

[7] In the second amended complaint, the plaintiffs allege some purportedly false or misleading statements that are not cited in their motion papers and were not discussed at argument. Those allegations are insufficient to state a claim for similar reasons as the allegations discussed in greater length.

(Id. ¶ 5.)[8] For the reasons that follow, none of these allegations satisfies Rule 9(b) or the PLSRA.

a

The heart of the plaintiffs' argument is their claim that the defendants disclosed that their invested assets exposed them to the risks of the non-prime or sub-prime mortgage markets, thereby implying that they had not taken on similar risks by selling CDSs that insured CDOs containing non-prime and sub-prime mortgages. Specifically, the plaintiffs argue that the defendants' statement that "there are sub-prime risks elsewhere in the balance sheet" including "in the portfolio of CDS business and the Financial Guarantee Re . . . [and] also in swaps" was insufficient to disclose the existence of such risks. (Pl. Mem. 12-13; SAC ¶ 79.) They also argue that the defendants spoke falsely or misleadingly by saying (1) that the sub-prime risks outside Swiss Re's invested assets were "less than the risk [Swiss Re was] exposed to through the investment that [it had] made recently in sub-prime bonds"; (2) that those risks were "not in leveraged form"; (3) that sub-prime exposure in

---

[8] In their motion papers, the plaintiffs do not argue that the defendants' alleged GAAP violations were actionable misrepresentations, instead citing them only to bolster their scienter allegations. Nevertheless, for the sake of completeness, the Court will consider their relevance as to both materiality and scienter.

Swiss Re's invested assets was "not in CDO form"; and (4) that "[t]he maximum potential loss assuming non-performance" by counterparties from whom Swiss Re purchased CDSs was approximately CHF 4.206 billion. (Pl. Mem. 7, 12-13, 15-16; SAC ¶¶ 77-79, 81.)

The gist of many of the plaintiffs' alleged misstatements or omissions was that Swiss Re failed to disclose that it had issued two CDSs that insured CHF 5.3 billion of assets, including sub-prime mortgage securities and asset-backed CDOs. It eventually suffered a CHF 1.2 billion loss on these CDSs when it suddenly wrote down the value of the CDOs and sub-prime securities that were insured by the CDSs. As explained below, however, the plaintiffs have failed to alleged with particularity that the defendants made any material misstatements or omissions with respect to the CDSs it had insured or that the defendants had any obligation to provide further disclosure with respect to the CDSs it had issued. Many of the allegations the plaintiffs rely on are based on various statements that the defendants made about the elements of its invested assets and incorrect assertions that they describe the CDSs that Swiss Re issued. The disclosures that were made about the possible exposure from the CDSs Swiss Re issued were not, based on the undisputed record, misrepresentations and Swiss Re was not required to make any further disclosures.

On August 7, 2007, Swiss Re announced that CHF 190 billion
of invested assets was "exposed to sub-prime of less than CHF
500 [million]", a statement which is not alleged to be untrue.
(SAC ¶ 79.) The statement plainly applied to Swiss Re's invested
assets rather than the products or insurance, such as CDSs, that
it issued. Quinn, in explaining the number, stated: "For the
sake of completeness . . . there are sub-prime risks elsewhere
in the balance sheet . . . . It will exist in the portfolio of
CDS business and the Financial Guarantee Re . . . also in swaps
and also elsewhere in the P&C book." (Id.) Contrary to the
plaintiffs' assertions, Swiss Re's statement that it had "sub-
prime risks . . . in the portfolio of CDS business and the
Financial Guarantee Re . . . [and] also in swaps" was sufficient
to disclose the existence of other risks related to the sub-
prime mortgage market. There is no obligation for an issuer to
identify specifically every type of asset or liability it
possesses, so long as its disclosures are "broad enough to
cover" all instruments that are in fact relevant to the value of
the issuer's securities. Hunt v. Alliance N. Am. Gov't Income
Trust, Inc., 159 F.3d 723, 730 (2d Cir. 1998). In Hunt, the
Court of Appeals for the Second Circuit held that disclosure
that a fund invested in "government guaranteed mortgage-related
securities" was sufficient to disclose the fund's investment in
"collateralized mortgage obligations," notwithstanding those

instruments' "distinct attributes (including far greater risk)."
Id. Similarly, here, the defendants disclosed that there were
sub-prime risks elsewhere in the balance sheet other than in
invested assets and that these included CDS activity and the
Financial Services division activity. The defendants did not
purport to quantify the specifics of that activity and were not
required to disclose it in more detail.

The plaintiffs compare their case to In re MBIA, Inc.,
Securities Litigation, 700 F. Supp. 2d 566 (S.D.N.Y. 2010), in
which Judge Karas denied a motion to dismiss a complaint based
on misleading disclosures of RMBS exposure. The difference
between the two cases is instructive. In In re MBIA, the
defendants' disclosures allegedly "differentiated between
'Multi-Sector CDOs with RMBS' and 'other CDOs,'" giving
approximate dollar totals for each, but did not disclose that
its "other CDOs" included "approximately $6 billion in CDOs-
squared containing RMBS." Id. at 571, 579. The defendants argued
that investors were on notice of the existence of RMBS in all
parts of its CDO portfolio because of a statement that the full
"range of asset classes is found throughout the entire Multi-
Sector CDO portfolio." Id. at 582. The court rejected this
argument, stating that it could not find as a matter of law that
this disclosure indicated "that each of the CDOs or CDOs-squared
in the portfolio contained the full range of assets, including

RMBS, rather than that the multi-sector portfolio as a whole contained a diverse set of assets." Id. Here, by contrast, the defendants never purported to identify the total amount of Swiss Re's liabilities that were tied to the sub-prime market, avoiding the In re MBIA defendants' first mistake, and specifically acknowledged the presence of sub-prime risk in CDSs and in the Financial Services division's activities, avoiding the second mistake.

The more specific statements that the plaintiffs allege were false or misleading are not borne out by the complaint. First, the plaintiffs allege that Quinn spoke falsely on August 7, 2007 by stating that Swiss Re's sub-prime-related activities outside its invested assets had "significantly less risk than the risk that [Swiss Re was] exposed to through the investment that [it had] made recently in sub-prime bonds." (SAC ¶ 79.) The plaintiffs argue that this statement was inaccurate because the two CDSs that were not specifically disclosed protected CHF 1.473 billion in sub-prime securities, while Swiss Re had only about CHF 500 billion invested in sub-prime assets. (Id. ¶¶ 56, 79.) However, a statement of relative risk is a statement of opinion, and as such is only actionable if "defendants deliberately misrepresented a truly held opinion." Podany v. Robertson Stephens, Inc., 318 F. Supp. 2d 146, 153-54 (S.D.N.Y. 2004). See Bond Opportunity Fund v. Unilab Corp., No. 99 Civ.

11074, 2003 WL 21058251, at *5 (S.D.N.Y. May 9, 2003), aff'd, 87
Fed. Appx. 772 (2d Cir. Feb. 10, 2004) (summary order) at 154
("Plaintiffs who charge that a statement of opinion . . . is
materially misleading . . . must allege 'with particularity'
'provable facts' to demonstrate that the statement of opinion is
both objectively and subjectively false." (internal quotation
omitted)); Va. Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1094
(1991) ("An opinion is a fact . . . . When the parties are so
situated that the buyer may reasonably rely upon the expression
of the seller's opinion, it is no excuse to give a false one."
(quoting Vulcan Metals Co. v. Simmons Mfg. Co., 248 F. 853, 856
(2d Cir. 1918) (alteration in original)). Quinn stated that the
sub-prime exposure outside of Swiss Re's investment portfolio
was less risky than the exposure inside that portfolio, not that
a smaller dollar amount was involved. There is no plausible
basis pleaded for concluding that Quinn did not reasonably hold
that opinion with respect to the risk of the subprime portion of
the two CDSs that Swiss Re issued. The two CDSs insured CHF
1.473 billion in sub-prime securities, but the ultimate loss
that Swiss Re incurred on these assets in November 2007 was only
CHF 560 million. (SAC ¶ 57.) Because the plaintiffs have not
alleged that the defendants did not actually hold this opinion,
or even that they possessed contradictory information about the

32

relative risk of the two types of exposure, this allegation is insufficient.

The plaintiffs also argue that a statement in a slide at the August 7, 2007 conference call was false when it stated: "Typically high credit quality sub-prime risks (AA minus or better) exist in portfolio CDS, swaps and Financial Guarantee Re, but not in leveraged form; risk is lower than exposure to subprime in invested assets." (Id. ¶ 79.) The plaintiffs state that this statement is false because the sub-prime components of the CDSs were, in fact, leveraged, because they were in CDOs. (Pl. Mem. 13.) This was not in fact one of the twelve alleged bases in the second amended complaint on which the alleged statements in the conference call and on the slide were allegedly false and misleading, and therefore cannot be the basis for resisting the motion to dismiss the second amended complaint that was specifically amended to avoid the first motion to dismiss. (See SAC ¶ 80.) Moreover, the interpretation now proffered by the plaintiffs was understandably not in the second amended complaint because it does not appear that the statement now highlighted by the plaintiffs referred to the contents of the two CDSs at issue in this case, and did not purport to say that no CDSs issued by Swiss Re insured any CDOs.

The plaintiffs also claim that Aigrain spoke falsely on the August 7 conference call by saying that "any of the sub-prime-

related exposure, direct or indirect in their format, are [sic] not in CDO form." (SAC ¶ 81.) This statement came in direct response to a question about Swiss Re's invested assets. (Burns Decl. Sept. 4, 2009, Ex. F.) Because the plaintiffs have not alleged that the CDSs at this issue in this case were part of the invested assets of Swiss Re, and because the statement said nothing about the makeup of the sub-prime-related exposure in other areas, or the two CDSs that are the focus of this Complaint, there is no basis for finding that Aigrain spoke falsely.

The plaintiffs also allege that the defendants' statements regarding the maximum potential loss from "derivative financial instruments including swaps, options, forwards, credit derivatives and exchange-traded financial futures in its trading and hedging strategies" were misleading, because they excluded the potential loss from the CDSs sold by Swiss Re's Financial Services division. (Pl. Mem. 15-16; Burns Decl. Oct. 9, 2009 Ex. B at 20.) However, these disclosures were clearly directed at swaps and similar instruments used in Swiss Re's "trading and hedging strategies," not disclosures regarding potential risks related to CDSs swaps issued to insure assets. Accordingly, there was no need for these statements to include the risks of the activity undertaken by the Financial Services division, and

a reasonable investor could not have reasonably understood them
to be describing those risks.

b

The plaintiffs argue that Swiss Re's portrayal of its risk
management strategies and aptitude give rise to a claim for
securities fraud, citing assertions that Swiss Re took a
"cautious stance" regarding various risks, that it could "manage
volatility," and that it engaged in "active management of
financial market risk." (SAC ¶¶ 66, 73, 77, 89.) Such statements
are "no more than 'puffery' which [do] not give rise to
securities violations," because they are "too general to cause a
reasonable investor to rely upon them. ECA & Local 134 IBEW
Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d
187, 205-06 (2d Cir. 2009) (holding that statements such as that
the defendant had "risk management processes that are highly
disciplined and designed to preserve the integrity of its risk
management process" are too general to be actionable (internal
quotation omitted)). Insofar as any of the defendants' "cautious
stance" statements could be interpreted as expressions of
opinion, rather than puffery, the plaintiffs have alleged no
particularized facts to allow a finding that the defendants did
not believe them. See Podany, 318 F. Supp. 2d at 153-54.

Nor did the defendants' statement that they hedged some of their assets by buying "protection . . . for both equity and credit risk" imply that the Financial Services division did not engage in the potentially risky provision of such protection to its customers. (SAC ¶ 68.) The defendants never claimed to have attempted to hedge all risks perfectly, and no reasonable investor could have concluded from a statement such as this that Swiss Re did not sell CDSs.

c

The second amended complaint alleges that the defendants repeatedly misstated the value of its CDS arrangements by failing to mark them to market value. (Id. ¶¶ 96, 129, 131.) The plaintiffs do not, however, provide any particularized source for their belief that the values reported by the defendants were inflated. Instead, they rely on the general deterioration of the sub-prime market and the housing sector more broadly, along with the fact that the defendants marked down the value of the CDS arrangements "in one fell swoop" rather than contemporaneously with this decline. (Id. ¶¶ 135-50, 154, 158.)

These general allegations do not provide the particularity required by Rule 9(b) and the PSLRA. Instead, they are based on mere speculation as to how a general trend in the sub-prime sector should have affected the defendants' belief in the value

of the CDSs. See In re Societe Generale, No. 08 Civ. 2495, at
*14 (slip op.) ("Allegations of knowledge of a general economic
(subprime) trend do not equate to harboring a mental state to
deceive, manipulate or defraud." (internal quotation omitted));
In re 2007 Novastar Fin., Inc., Secs. Litig., No. 07-0139-CV,
2008 WL 2354367, at *1 (W.D. Mo. June 4, 2008), aff'd, 579 F.3d
878 (8th Cir. 2009) ("[W]hile the Court can take judicial notice
of the fact that the Company's industry suffered reversals, the
Court cannot take judicial notice of the impact of those
industry-wide reversals on the Company."). Nothing in the second
amended complaint contradicts with particularity either the
sincerity or the accuracy of the defendants' contemporaneous
estimations, and thus the plaintiffs present nothing more than
an argument that the defendants should have foreseen the
unraveling of their CDSs before they did. See Denny v. Barber,
576 F.2d 465, 470 (2d Cir. 1978) ("[T]he complaint is an example
of alleging fraud by hindsight. For the most part, plaintiff has
simply seized upon disclosures made in later annual reports and
alleged that they should have been made in earlier ones.");
DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990) ("For
any bad loan the time comes when the debtor's failure is so
plain that the loan is written down or written off. No matter
when a bank does this, someone may say that it should have acted
sooner. If all that is involved is a dispute about the timing of

the writeoff, based on estimates of the probability that a particular debtor will pay, we do not have fraud . . . .").

B

The defendants also argue that the second amended complaint fails to allege that the defendants acted with the scienter necessary to support a Rule 10b-5 claim. The scienter required to support a securities fraud claim can be "intent to deceive, manipulate, or defraud, or at least knowing misconduct." AIG Global Sec. Lending Corp. v. Banc of Am. Sec., LLC, No. 01 Civ. 11448, 2005 WL 2385854, at *8 (S.D.N.Y. Sept. 26, 2005) (quoting SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996)). The PSLRA requires that a complaint alleging securities fraud must "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Scienter may be inferred from (i) facts showing that a defendant had "both motive and opportunity to commit the fraud," or (ii) facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness." ATSI Commc'ns, 493 F.3d at 99. Further, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007). A complaint

38

sufficiently alleges scienter when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324; see also ATSI Commc'ns, 493 F.3d at 99.

The plaintiffs do not allege that the defendants had motive to commit fraud, attempting instead to show conscious misbehavior or recklessness. (Hr'g Tr. 28, July 29, 2010.) Where motive is not apparent, "the strength of the circumstantial allegations must be correspondingly greater." Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001) (internal quotation omitted). The Court of Appeals for the Second Circuit has explained that "reckless conduct is, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Chill v. Gen. Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996) (internal quotation omitted); Kalnit, 264 F.3d at 142. In some cases, recklessness can be inferred from "[a]n egregious refusal to see the obvious, or to investigate the doubtful." Chill, 101 F.3d at 269 (internal quotation omitted).

Because, as explained above, the plaintiffs have failed to allege false or materially misleading statements, they have also failed to raise a strong inference of conscious misbehavior or

recklessness. Cf. Ronconi v. Larkin, 253 F.3d 423, 429 (9th Cir. 2001) ("[F]alsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts . . . ."). Even if any of the alleged statements were actionable, the plaintiffs have failed to allege with particularity any contrary information that rendered the defendants' statements reckless or worse. Instead, the plaintiffs rely on general facts about the financial world as a substitute for specific facts about either the defendants' knowledge or the true condition of Swiss Re's balance sheet. But "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000). "Merely alleging that there were signs of problems in the subprime mortgage market is not sufficient to show that the . . . defendants knew that [their] disclosures were false or misleading." In re Citigroup Inc. S'holder Derivative Litig., 964 A.2d 106, 135 (Del. Ch. 2009); accord In re Citigroup Inc. S'holder Derivative Litig., No. 07 Civ. 9841, 2009 WL 2610746, at *8 (S.D.N.Y. Aug. 25, 2009).[9] Nor does the plaintiffs' allegation that the individual

---

[9] The cases that the plaintiffs cite are not to the contrary. In In re Countrywide Financial Corp. Securities Litigation, the court noted that the market's "recent downturn" would be relevant to causation, because it would be necessary "to determine which losses were proximately caused by Countrywide's misrepresentations and which are due to extrinsic or

defendants served on an executive committee that monitored

"operational risks" give rise to a strong inference of scienter

in the absence of any particularized allegation of contrary

information possessed by the members of the committee. (SAC ¶

166-67.)

     The plaintiffs also argue that Swiss Re's alleged failure

to report the CDSs consistent with GAAP supports an inference of

scienter. While GAAP violations can support an inference of

scienter, "[a]llegations of a violation of GAAP provisions or

SEC regulations, without corresponding fraudulent intent, are

not sufficient to state a securities fraud claim." Chill, 101

F.3d at 270. Here, the defendants allegedly failed to comply

with FIN 45, a provision that generally does not apply to

reinsurers. (SAC ¶ 118 n.3.) Although this omission certainly

could be evidence of scienter, that inference is not as strong

as the inference that the defendants innocently missed the

applicability of FIN 45, particularly in light of the paucity of

other evidence of scienter. See Tellabs, 551 U.S. at 324 ("A

complaint will survive . . . only if a reasonable person would

deem the inference of scienter cogent and at least as compelling

---

insufficiently linked forces." 588 F. Supp. 2d 1132, 1174 (C.D.
Cal. 2008). Contrary to the plaintiffs' description, the court
never discussed the general sub-prime mortgage crisis as
relevant to scienter. See id. at 1185-97. In re 2007 Novastar
similarly lacks any suggestion that the crisis is relevant to
scienter, and, in addition, found that the complaint failed to
support an inference of scienter. 2008 WL 2354367, at *4.

as any opposing inference one could draw from the facts alleged."); id. at 326 ("[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically.).

## V

The plaintiffs also allege control person liability under section 20(a). "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI Commc'ns, 493 F.3d at 108 (internal quotation omitted). Because, as discussed above, the plaintiffs have failed to allege a primary violation of the exchange Act, their claim under section 20(a) must also be dismissed. See id.

## CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, they are either moot or without merit. For the reasons explained above, the defendants' motion is **granted** and the complaint is **dismissed**

**with prejudice.**[10] The Clerk is directed to enter judgment

dismissing this action and closing this case.

SO ORDERED.

Dated:    New York, New York
          October / , 2010

                                        _____
                                             John G. Koeltl
                                        United States District Judge

---

[10] Because the plaintiffs have twice sought to amend their
complaint without improving on the allegations contained
therein, and were given the opportunity to file a supplemental
affidavit in response to Morrison (Hr'g Tr. 19-20, July 14,
2010; Atkinson Aff.), the dismissal is with prejudice.